UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SHARON MCGUIRE, as parent and
natural guardian of K.M., and J.M.,

       Plaintiffs,

v.                                               Case No.  8:11-cv-559-T-24 TBM

NATIONWIDE ASSURANCE COMPANY,

       Defendant.
_____/

## **ORDER**

This cause comes before the Court on Defendant's Motion for Summary Judgment.
(Doc. No. 27).  Plaintiffs oppose the motion.  (Doc. No. 31).  Defendant has filed a reply brief.
(Doc. No. 34).  As explained below, Defendant's motion is granted.

## **I.  Standard of Review**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute
as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.
56(a). The Court must draw all inferences from the evidence in the light most favorable to the
non-movant and resolve all reasonable doubts in that party's favor.  See Porter v. Ray, 461 F.3d
1315, 1320 (11th Cir. 2006)(citation omitted).  The moving party bears the initial burden of
showing the Court, by reference to materials on file, that there are no genuine issues of material
fact that should be decided at trial.  See id. (citation omitted).  When a moving party has
discharged its burden, the non-moving party must then go beyond the pleadings, and by its own
affidavits, or by depositions, answers to interrogatories, and admissions on file, designate
specific facts showing there is a genuine issue for trial.  See id. (citation omitted).

## II.  Background

Plaintiffs contend that Defendant Nationwide Insurance Company acted in bad faith in the handling of the insurance claims relating to the injuries sustained by Kimberly Miller ("Ms. Miller") in an auto accident.  At the time of the accident, Defendant's insured, Paul E. Torrey, II, had an auto insurance policy with Nationwide that had bodily injury limits of $25,000 per person and $50,000 per accident, as well as a property damage limit of $10,000.

On April 25, 2008, Torrey was driving while intoxicated and struck a motorcycle operated by William Swails and occupied by Ms. Miller.  As a result of the accident, Swails died and Ms. Miller suffered significant brain injury.[1]  The parties in this case do not dispute that Torrey was at fault for the accident.

On May 8, 2008, Nationwide received notice of the accident.  On May 9, 2008, Nationwide was advised that Kevin Gallagher would be representing Ms. Miller for her claims arising from the accident.  The same day, Nationwide sent a letter to Torrey advising him that: (1) Nationwide believed that the two bodily injury claims would likely exceed his policy limits; (2) Nationwide would attempt to settle the claims within his policy limits, but if it could not and the claims went to trial and resulted in a verdict for more than the policy limits, he would be responsible for paying the excess amount; and (3) it may be advisable for Torrey to consult an attorney.  (Doc. No. 27-4).

On May 12, 2008, Nationwide sent a letter to Gallagher stating that it was prepared to tender the $25,000 policy limit to Ms. Miller at Gallagher's direction.  (Doc. No. 27-5).  Prior to

---

[1]The claim relating to the death of Swails was resolved by Nationwide for the policy limits of $25,000.  Therefore, this bad faith action consists solely of the handling of the claims relating to Ms. Miller.

the May 12, 2008 letter, Gallagher was representing Ms. Miller's interests by helping Plaintiff Sharon McGuire, Ms. Miller's mother, pursue Ms. Miller's claim against Torrey. (McGuire depo,[2] p. 14). After receiving the May 12, 2008 letter, McGuire and Gallagher decided that McGuire did not need him to represent Ms. Miller's interests and that McGuire could settle the claim with Torrey through Nationwide on her own. (McGuire depo, p. 14-15).

Thereafter, on May 14, 2008, McGuire called Nationwide and offered to settle Ms. Miller's claim for the $25,000 policy limit, plus Nationwide's payment of the cost of setting up a guardianship for Ms. Miller. (McGuire depo, p. 15). McGuire contends that Nationwide refused to pay for the cost of setting up a guardianship for Ms. Miller.[3] (McGuire depo, p. 23, 31).

During the May 14, 2008 phone conversation, Nationwide learned that Ms. Miller had a seventeen year old son, Justin Miller ("Mr. Miller"). Pursuant to Florida Statute § 768.0415, an unmarried dependent can assert a claim for damages against a person who, through negligence, causes significant permanent injury to the dependent's parent. Thus, Mr. Miller could assert a claim against Torrey for his mother's injuries.[4]

---

[2]McGuire's deposition is filed at Doc. No. 28.

[3]Nationwide disputes that McGuire asked it to pay for the cost of setting up a guardianship for Ms. Miller. However, because this is a motion for summary judgment, the Court must construe the facts in the light most favorable to Plaintiffs.

[4]It is unclear whether McGuire attempted to settle Mr. Miller's claims during the May 14, 2008 phone call. McGuire stated in her deposition that she never attempted to settle the claim of Mr. Miller with Nationwide. (McGuire depo, p. 24). However, in connection with the instant motion for summary judgment, McGuire filed an affidavit in which she states that she was attempting to resolve *all* claims relating to Ms. Miller's injuries during the May 14, 2008 phone call and would have signed a release that released all claims if Nationwide had agreed to pay the $25,000 policy limit and the cost of setting up a guardianship for Ms. Miller. (Doc. No. 30-1). Regardless of whether McGuire attempted to settle Mr. Miller's claims during the May 14, 2008 phone call, the result in this case is the same.

On May 15, 2008, McGuire informed Nationwide that Gallagher "may" decide to represent Ms. Miller's interests. That same day, Nationwide wrote to Gallagher and reasserted its request that Gallagher provide Nationwide with direction as to how Nationwide should proceed to tender the $25,000 policy limit. (Doc. No. 27-6). On May 16, 2008, Nationwide wrote to McGuire (due to its uncertainty regarding whether Gallagher was representing Ms. Miller) and reasserted its intention to tender the $25,000 policy limit in exchange for a release of all claims against Torrey. (Doc. No. 27-7).

On May 20, 2008, Gallagher wrote to Nationwide and stated that he represented McGuire. (Doc. No. 27-8). In the letter, Gallagher informed Nationwide that he understood that McGuire had asked Nationwide to pay for some or all of the cost of setting up Ms. Miller's guardianship during the May 14, 2008 phone call, but Nationwide declined her request. (Doc. No. 27-8).

On May 21, 2008, Nationwide responded to Gallagher's letter by stating that had McGuire asked Nationwide to assist her financially to set up the guardianship, Nationwide would have done so. (Doc. No. 27-9). Additionally, Nationwide reiterated that it remained prepared to tender the $25,000 policy limit. (Doc. No. 27-9). Nationwide also pointed out the trouble it was having communicating directly with Gallagher on the phone and asked that Gallagher call as soon as possible. (Doc. No. 27-9).

The next day, on May 22, 2008, Nationwide sent Gallagher a letter with two enclosures—(1) a $25,000 settlement check payable to Gallagher's trust account for the benefit of Ms. Miller once the guardianship was established, and (2) a proposed release of claims against Torrey. (Doc. No. 27-10). In the letter, Nationwide explained that it was open to any changes to

the release that Gallagher might suggest and to contact Nationwide immediately with any proposed changes. (Doc. No. 27-10).

Two weeks later, on June 5, 2008, Gallagher wrote to Nationwide and responded that "[t]he release and check submitted are unacceptable." (Doc. No. 27-11). Specifically, Gallagher stated that McGuire would not agree to the release due to the following four alleged defects: (1) he objected to a release that "require[d] indemnity, hold harmless or similar terms in favor of [Torrey];" (2) he stated that "[t]he release must not be assignable by [Torrey];" (3) he stated that the release "must not contain any statements indicating that liability is not accepted or is doubtful;" and (4) he stated that McGuire would not agree to release Torrey from punitive or exemplary damages. (Doc. No. 27-11).

In the June 5, 2008 letter, Gallagher proposed the settlement of Ms. Miller's claims if Nationwide met certain conditions. (Doc. No. 27-11). Specifically, Gallagher stated that McGuire needed financial assistance in setting up the guardianship and that based on Nationwide's prior letter, he assumed that Nationwide would provide such assistance. (Doc. No. 27-11). As such, Gallagher requested a letter from Nationwide agreeing to pay for the cost of setting up Ms. Miller's guardianship. (Doc. No. 27-11). Additionally, Gallagher stated that Ms. Miller had lost certain articles of clothing, valued at $100, due to the accident and asked for reimbursement in addition to the payment for her bodily injury claim.

Gallagher closed the June 5, 2008 letter by stating the following:

> At this time, subject only to the conditions in this letter, [McGuire] will settle all claims for bodily injury and property damages to [Ms. Miller] arising out of this incident in exchange for a tender of all available limits of liability and excess coverage. We will hold the check you previously delivered until you have had time to respond to my client's offer. Your insured, and if unwilling for any reason, a claims manager from Nationwide must provide a sworn statement accepting all

> liability for causing this accident. So long as we receive the items referenced in this letter within twenty (20) days . . . , we will be in a position to resolve these bodily injury claims.

(Doc. No. 27-11).  Thus, Gallagher's June 5, 2008 settlement demand expired on June 25, 2008.

On June 9, 2008, Nationwide wrote Torrey and reiterated its belief that the value of the claims related to the accident exceeded his policy limits.  (Doc. No. 27-12).  Additionally, Nationwide informed Torrey that it had received a settlement demand from Gallagher and enclosed Gallagher's June 5, 2008 letter.  (Doc. No. 27-12).  Nationwide also informed Torrey that it had hired an attorney to represent him if the claims related to the accident could not be settled and went to trial.  (Doc. No. 27-12).

On June 10, 2008, Nationwide sent Gallagher the requested letter stating that Nationwide agreed to pay the cost of setting up a guardianship for Ms. Miller.  (Doc. No. 27-13).

On June 16, 2008, Nationwide's attorney, John Russell, wrote to Gallagher seeking clarification regarding Gallagher's June 5, 2008 demand letter.  (Doc. No. 27-14).  Specifically, Russell asked what Gallagher meant when he stated that the release must not be assignable by Torrey, because it was not clear where in the proposed release such right to assign had been set forth.  (Doc. No. 27-14).  Additionally, Russell asked what amount he was seeking as reimbursement for Ms. Miller's property damages—Gallagher's letter stated that her clothes were worth $100, but his letter closed with the request that Nationwide tender "all available limits of liability and excess coverage."  (Doc. No. 27-14).  Thus, Russell was unsure whether Gallagher was seeking $100 or the $10,000 property damage policy limit when asking for reimbursement for Ms. Miller's clothing/property damages.  (Doc. No. 27-14).  Russell closed his June 16, 2008 letter by stating that Nationwide would like to comply with all of the

conditions set forth in Gallagher's settlement demand and requested that the June 25, 2008 deadline be extended to July 15, 2008. (Doc. No. 27-14).

On June 16, 2008, Russell wrote a letter to Torrey that explained all of the conditions set forth in Gallagher's June 5, 2008 settlement demand. (Doc. No. 27-15). Russell also stated that Nationwide intended to accept Gallagher's settlement demand. (Doc. No. 27-15). Additionally, Russell reiterated that Nationwide had hired an attorney to defend him if any claims related to the accident could not be settled and went to trial. (Doc. No. 27-15).

Torrey's criminal attorney, Terrence Matthews, wrote a letter in response to Gallagher's settlement demand, which was sent to Nationwide on June 16, 2008. (Doc. No. 27-16). Matthews stated that Torrey had no objection to settling Ms. Miller's claims for the policy limit, but Torrey would not authorize a statement accepting liability for the accident. (Doc. No. 27-16). Specifically, Matthews stated:

> Mr. Torrey, however, does not admit any liability for the accident or the injuries, and refuses to sign an affidavit or other statement admitting liability. He rejects the admission of liability as a condition of the settlement . . . .
>
> [It has also been requested] that Mr. Torrey "authorize" a claims manager from Nationwide to provide a sworn statement. Mr. Torrey rejects and refuses any "authorization" for a claims manager to execute any affidavit on behalf of Mr. Torrey admitting liability for the underlying tort. Mr. Torrey, however, does not object to a claims manager executing an affidavit on behalf of Nationwide accepting financial responsibility for the payment of the damages claimed in the full amount of the policy limits in order to settle the cases. The affidavit should be explicit that the person making the affidavit is doing so on behalf of Nationwide and not Mr. Torrey, and there should be nothing contained therein that may be construed as an admission on the part of Mr. Torrey that he caused or is liable for the subject accident.

(Doc. No. 27-16).

On June 19, 2008, Russell wrote to Gallagher again, this time seeking clarification of the

condition in the settlement demand that Torrey or a Nationwide claims manager provide a sworn statement accepting all liability for causing the accident. (Doc. No. 27-17). Specifically, Russell asked Gallagher to clarify what he meant by a "statement accepting all liability for causing this accident" if the statement was made by a Nationwide claims manager; Russell asked:

> Are you requiring that Nationwide itself accept liability for causing the accident? Are you requiring that Nationwide accept liability on behalf of Mr. Torrey for causing the accident? Are you requiring that Nationwide accept liability to pay its coverage under the policy, up to the bodily injury liability limits for this accident? Do you mean something else that I have not listed?

(Doc. No. 27-17). Additionally, Russell pointed out that he had not received a response to his June 16, 2008 letter in which he requested clarification of other conditions in the settlement demand, as well as an extension to the deadline for complying with the settlement demand. (Doc. No. 27-17).

On June 23, 2008, Gallagher wrote a letter to Russell in response to Russell's June 16th and 19th letters. (Doc. No. 27-18). In the letter, Gallagher gave a cryptic explanation regarding what he meant in his June 5, 2008 letter when he stated that the release must not be assignable by Torrey. (Doc. No. 27-18). Gallagher failed to address Russell's request for clarification regarding the amount being sought for Ms. Miller's clothing/property damage claim. (Doc. No. 27-18). Furthermore, it is not clear if Gallagher even acknowledged Russell's request for clarification regarding the condition that a Nationwide claims manager provide a sworn statement accepting all liability for causing the accident, because the only statements in Gallagher's letter that may purport to address this issue is the following:

> As to the last issue[5] I really must admit I am puzzled. I don't even want to discuss

---

[5]Gallagher never identifies what the "last issue" is that he is purporting to address.

the content of your letter with my clients as it will only exacerbate their suffering. I suppose this is the insurance company's way of dealing with all these cases, fight liability to the last moment and then cave in so the jury thinks the Defendant is riding the white horse. Are we reading the same police report? My clients simply want closure.

(Doc. No. 27-18). Regardless, these statements do not provide any insight regarding what Gallagher is seeking when he requested a statement by a Nationwide claims manager accepting all liability for causing the accident. Finally, Gallagher closes the letter by stating:

I trust I have answered your questions and I really don't see that there is any confusion with the offer. Certainly nothing that necessitates an extension of time. Please let me know if there is anything further that we need to discuss.

(Doc. No. 27-18).

On June 23, 2008, Nationwide sent Gallagher a letter containing a $100 check payable to Gallagher's trust account for Ms. Miller's clothing. (Doc. No. 27-19). Additionally, Nationwide enclosed a sworn statement from a Nationwide claims manager stating that Nationwide "accept[ed] liability under the Nationwide policy for damages for bodily injury and property damage arising out of the April 25, 2008 accident, subject to all terms and provisions of the Nationwide policy." (Doc. No. 27-19).

On June 24, 2008, Russell wrote to Gallagher, stating that Gallagher's June 23, 2008 letter did not provide the clarification that he had requested and pointing out that Gallagher would not take or return his phone calls over the last week. (Doc. No. 27-20). However, Russell enclosed releases for Ms. Miller's bodily injury and property damage claims and stated that he believed that Nationwide had diligently complied with all of the conditions set forth in Gallagher's June 5, 2008 settlement demand. (Doc. No. 27-20).

On July 17, 2008, Gallagher wrote to Nationwide to inform it that a settlement had not

been reached.  (Doc. No. 27-21).  Specifically, Gallagher stated:

> [Nationwide] failed to comply with the terms and conditions of our client's settlement offer.  Specifically, the release is unacceptable and seeks to resolve claims which were outside of my client's offer.  It is unfortunate that Nationwide has attempted to extract a resolution of claims which were not offered by my client.  As such, my client will be seeking a full recovery for damages through the court system.

(Doc. No. 27-21).

Though not fully explained in his July 17, 2008 letter, Gallagher found the release to be unacceptable because he believed Nationwide worded it to release not only Ms. Miller's own claims, but also her son's derivative claim.  The Bodily Injury Release provided the following, in relevant part:

> That _____ as Guardian for KIMBERLY MILLER, for and in consideration of [$25,000] . . . , does hereby and by these presents, fully acquit, release and forever discharge PAUL E. TORREY, II of and from ***any and all claims, damages, actions and causes of action, whether arising at law or in equity, whether direct or derivative, which KIMBERLY MILLER may have had, may now have or may hereafter have for, based on, or arising out of her bodily injury claims for the motor vehicle accident on April 25, 2008*** in Bradenton, Florida. Notwithstanding anything herein to the contrary, _____ as Guardian for KIMBERLY MILLER does not release any claims against PAUL E. TORREY, II and this release does not include a release of any claims against PAUL E. TORREY, II for punitive or exemplary damages arising out of the April 25, 2008 accident in Bradenton, Florida.
>
> And for the same consideration, _____ as Guardian for KIMBERLY MILLER, does hereby state and declare:
> *     *     *
> . . . that he/she has voluntarily **agreed** to accept this settlement of any and all bodily injury claims by KIMBERLY MILLER against PAUL TORREY, II, with the exception of any claims for punitive or exemplary damages, arising out of the motor vehicle accident on or about April 25, 2008 in Bradenton, Florida.

(Doc. No. 27-20)(emphasis added).

Thereafter, on August 13, 2008, McGuire and Mr. Miller (Ms. Miller's son) filed suit

against Torrey in state court. On February 7, 2011, Torrey assigned his bad faith claim against Nationwide to McGuire and Mr. Miller. (Doc. No. 1-2). On February 23, 2011, the state court entered judgment against Torrey for $6.5 million for McGuire, as guardian for Ms. Miller, and $500,000 for Mr. Miller. (Doc. No. 27-25).

On March 16, 2011, Plaintiffs McGuire, as guardian for Ms. Miller, and Mr. Miller filed the instant bad faith lawsuit against Nationwide. Currently pending before the Court is Nationwide's motion for summary judgment.

### III.  Motion for Summary Judgment

Nationwide argues that it is entitled to summary judgment, because it did not act in bad faith. Nationwide's motion focuses primarily on its arguments that: (1) Gallagher's June 5, 2008 settlement demand did not provide a realistic opportunity to settle; and (2) Nationwide acted reasonably when it tendered the Bodily Injury Release, because the execution of that release would have had no effect on Mr. Miller's claim against Torrey.

In response, Plaintiffs fail to address Nationwide's arguments, and instead, Plaintiffs argue that Nationwide acted in bad faith by: (1) refusing to accept McGuire's May 14, 2008 telephonic offer to settle for $25,000, plus payment of the cost of setting up Ms. Miller's guardianship, and (2) failing to communicate McGuire's May 14, 2008 offer to Torrey and advise him of what he could do to accept the offer. Thereafter, Nationwide was permitted to file a reply brief in order to address the arguments asserted in Plaintiffs' response.

Accordingly, the Court will address Nationwide's argument that it did not act in bad faith by analyzing Nationwide's conduct regarding: (1) Nationwide's refusal to accept McGuire's May 14, 2008 telephonic offer to settle; (2) Nationwide's failure to communicate McGuire's

May 14, 2008 telephonic offer to settle to Torrey and advise him what he could do to accept the offer; (3) Nationwide's ability to meet the conditions set forth in Gallagher's June 5, 2008 settlement demand (and thus, whether such demand presented a realistic opportunity for settlement); and (4) Nationwide's communication with Torrey regarding Gallagher's June 5, 2008 settlement demand. As explained below, it is clear that Nationwide did not act in bad in the handling of the claims against Torrey, and as such, Nationwide is entitled to summary judgment.

### A.  Law Regarding Bad Faith Claims Handling

In <u>Berges v. Infinity Insurance Co.</u>, the Florida Supreme Court explained the purpose of bad faith insurance law:

> Bad faith law was designed to protect insureds who have paid their premiums and who have fulfilled their contractual obligations by cooperating fully with the insurer in the resolution of claims.  The insurance contract requires that the insured surrender to the insurance company control over whether the claim is settled.  In exchange for this relinquishment of control over settlement and the conduct of the litigation, the insurer obligates itself to act in good faith in the investigation, handling, and settling of claims brought against the insured.  Indeed, this is what the insured expects when paying premiums.  Bad faith jurisprudence merely holds insurers accountable for failing to fulfill their obligations . . . .

896 So. 2d 665, 682-83 (Fla. 2005).

Twenty-five years earlier, the Florida Supreme Court set forth the standard to be applied in bad faith litigation:

> An insurer, in handling the defense of claims against its insured, has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business.  For when the insured has surrendered to the insurer all control over the handling of the claim, including all decisions with regard to litigation and settlement, then the insurer must assume a duty to exercise such control and make such decisions in good faith and with due regard for the interests of the insured.  This good faith duty obligates the insurer

12

> to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same. The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so.

Boston Old Colony Ins. Co. v. Gutierrez, 386 So. 2d 783, 785 (Fla. 1980)(internal citations omitted). Thus, "[a]n insurer cannot escape liability for breach of the duty of good faith by acting upon what it considers to be its interest alone." Id. at 786.

In determining whether an insurer has acted in bad faith in handling a claim, the totality of the circumstances standard is applied. See Berges, 896 So. 2d at 680 (citation omitted). While the issue of whether an insurer acted in bad faith is ordinarily a question for the jury, courts have, in certain circumstances, concluded as a matter of law that the insurance company did not act in bad faith. See id. (citation omitted).

## B. Refusing to Accept McGuire's May 14, 2008 Telephonic Offer to Settle

Plaintiffs contend that Nationwide acted in bad faith when it refused to accept McGuire's May 14, 2008 telephonic offer to settle in return for the $25,000 bodily injury limit, plus the cost of setting up Ms. Miller's guardianship. Nationwide responds that it could not have acted in bad faith, because it offered to pay the $25,000 policy limit, and that was all that it was required to pay under the policy.

Plaintiffs argue, without citing the specific section of the policy, that Nationwide was required to pay the cost of setting up Ms. Miller's guardianship. It appears that Plaintiffs are relying on the "Additional Payments" provision in the policy, which states that Nationwide "will pay, in addition to our limit of liability: (1) All costs we incur in the settlement of any claim or

defense of any suit."[6]  However, the plain language of this provision does not *obligate* Nationwide to incur any costs, including the cost to set up a guardianship.  Instead, this provision simply provides that if Nationwide incurs costs in settling or defending a claim, Nationwide will not seek reimbursement of those costs by reducing the available policy limits by the amount expended on such costs.  Thus, if Nationwide pays the full policy limits to settle a claim, and in doing so, Nationwide incurs costs, Nationwide will pay those costs *in addition to* the payment of the full policy limits.

Plaintiffs cite no case law to support their contention that the "Additional Payments" provision obligates Nationwide to pay the cost of setting up Ms. Miller's guardianship. Furthermore, the Court finds the "Additional Payments" provision to be unambiguous, and it clearly does not impose a duty on Nationwide to pay the cost of setting up a guardianship in addition to paying the $25,000 bodily injury policy limit.  See, e.g., Sachs v. Ill. Farmers Ins. Co., 2007 WL 2177954, at *3 (Minn. App. July 31, 2007)(construing the same policy language as not obligating the insurer to pay the tort-plaintiff's costs awarded by the court); Hughs v. Mid-Century Ins. Co., 38 Cal. App. 4th 1176, 1182 (Cal. App. 1995)(same).  Accordingly, the Court concludes that Nationwide did not act in bad faith in refusing to pay the cost of setting up Ms. Miller's guardianship when McGuire demanded such in her May 14, 2008 telephone call.[7]

---

[6]Plaintiffs cite to page 8 of the policy to support their argument that Nationwide was required to pay the cost of setting up Ms. Miller's guardianship.  Thus, it appears that Plaintiffs are referring to the "Additional Payments" provision.

[7]The Court notes that Nationwide later agreed to pay the cost of setting up Ms. Miller's guardianship.  However, the Court does not find that Nationwide's gratuitous agreement to pay such cost in any way shows that Nationwide was actually obligated to do so under the insurance policy.  Instead, it shows that Nationwide attempted, in good faith, to settle Ms. Miller's claims by agreeing to undertake an obligation that the insurance policy did not impose, in addition to

## C.  Failing to Communicate McGuire's May 14, 2008 Telephonic Offer to Torrey

Next, Plaintiffs contend that Nationwide acted in bad faith when it failed to communicate McGuire's May 14, 2008 telephonic offer to settle to Torrey and advise him what he could do to accept the offer.  Nationwide does not dispute that it did not inform Torrey of McGuire's May 14, 2008 telephonic offer to settle and advise him what he could do to accept the offer.  However, Nationwide argues that its failure to communicate with Torrey about the May 14th offer did not cause Torrey to be exposed to the excess judgment, because Torrey would not have contributed the money necessary to set up the guardianship (and thus, there was no realistic opportunity to settle based on McGuire's offer).

The Florida Supreme Court has explained that the failure to inform an insured of a settlement opportunity can be evidence of bad faith:

> The duty to inform the insured of settlement opportunities is one of the duties subsumed within the duty of good faith owed by an insurer to an insured.  The failure to inform the insured of the settlement offer does not automatically establish bad faith; it is simply one factor for the jury to consider in determining whether the insurer acted in bad faith.

Berges, 896 So. 2d at 680 (citation omitted).  Furthermore, to the extent that an insurer argues that its failure to communicate a settlement offer to its insured did not result in an excess judgment, because there was no realistic possibility of settlement, the Court notes:

> Any question about the possible outcome of a settlement effort should be resolved in favor of the insured; the insurer has the burden to show not only that there was no realistic possibility of settlement within policy limits, but also that the insured was without the ability to contribute to whatever settlement figure that the parties could have reached.

Powell v. Prudential Property & Cas. Ins. Co., 584 So. 2d 12, 14 (Fla. 3d DCA 1991)(citations

---

paying the $25,000 bodily injury limit.

omitted).

In the instant case, Nationwide has shown that there was no realistic possibility of settling within the $25,000 bodily injury limit, because Nationwide offered the $25,000 bodily injury limit, but McGuire was also asking for payment of the cost of setting up Ms. Miller's guardianship. Furthermore, as explained below, Nationwide has shown that Torrey would not have paid the cost of setting up Ms. Miller's guardianship.

McGuire stated that when she was looking into the cost of setting up the guardianship, she thought she was quoted $6,000 or $7,000. (McGuire depo, p. 33). Nationwide, however, contends that Torrey was unable or unwilling to contribute such funds. Nationwide supports this contention by pointing out that when it was considering Ms. Miller's property damage claim (and the fact that she may have been seeking the $10,000 property damage limit based solely on her loss of $100 worth of clothing), Torrey was unable or unwilling to contribute $9,900 in order to satisfy McGuire's demand (as Nationwide would only pay for the $100 substantiated clothing loss). (Matthews depo,[8] p. 28). Thus, Torrey would not have contributed the funds to pay the cost of the guardianship if Nationwide had asked him to do so in order to accept McGuire's May 14, 2008 settlement offer. Stated differently, even if Nationwide had informed Torrey about McGuire's May 14, 2008 demand and advised him to accept it, Torrey would have been unwilling or unable to do so, and her offer would still have been rejected. Accordingly, Nationwide's failure to communicate with Torrey about this offer did not result in the excess judgment, and without causation, there can be no bad faith damages. See Perera v. U.S. Fidelity & Guaranty Co., 35 So. 3d 893, 902 (Fla. 2010)(stating that the damages being sought must have

---

[8]Matthews' deposition is filed at Doc. No. 34-1.

been caused by the insurer's bad faith).

### D.  Nationwide's Ability to Meet the Conditions of the June 5th Settlement Demand

Nationwide argues that Gallagher's June 5, 2008 settlement demand did not present a realistic opportunity for settlement, because: (1) it was impossible to meet the condition of supplying the requested statement accepting all liability for causing the accident; and (2) Plaintiffs refused to accept the Bodily Injury Release.  Accordingly, the Court will analyze both demand conditions.

### 1.  Sworn Statement Accepting All Liability

Nationwide argues that Gallagher's June 5, 2008 settlement demand did not present a realistic opportunity for settlement, because it was impossible to meet the condition of supplying the requested statement accepting all liability for causing the accident.  In support of this argument, Nationwide points out that Torrey was quite clear that he would not make such a statement, nor would he authorize Nationwide to do so on his behalf.  (Doc. No. 27-16). Furthermore, Nationwide points out that in the underlying state court tort action, Plaintiffs argued to the state court judge that providing a statement accepting all liability for causing the accident was one of the conditions for accepting the June 5, 2008 settlement demand, and the statement from Nationwide's claim manager did not comply.[9]

Plaintiffs have not specifically addressed Nationwide's argument on this issue, and as such, the Court deems their silence to be a concession as to the merits of this argument.

---

[9]Nationwide intervened in the state court action and filed a motion to enforce settlement, arguing that Ms. Miller's claims against Torrey had been settled when Nationwide complied with Gallagher's June 5, 2008 settlement demand.  (Doc. No. 27-22; Doc. No. 27-23).  The state court judge held a hearing on the motion and found that there was not mutual consent to the settlement terms.  (Doc. No. 27-23, p. 50 of 51).

Accordingly, the Court finds that Nationwide has shown that Gallagher's June 5, 2008 settlement demand did not present a realistic opportunity for settlement, because it was impossible to meet the condition of supplying the requested statement accepting all liability for causing the accident.

### 2. Bodily Injury Release

Nationwide also argues that Gallagher's June 5, 2008 settlement demand did not present a realistic opportunity for settlement, because Plaintiffs refused to accept the Bodily Injury Release. Nationwide points out that Plaintiffs argued to the state court judge that the release was rejected because Gallagher believed that Nationwide worded it to release not only Ms. Miller's own claims, but also her son's derivative claim. Specifically, Gallagher took issue with the fact that the document states that Torrey is being released "from any and all claims, . . . *whether direct or derivative*, which KIMBERLY MILLER may have had, may now have or may hereafter have" relating to the April 25, 2008 accident. (Doc. No. 27-20, p. 5; Doc .No. 27-23).

Nationwide points out, however, two very important things: (1) the person executing the release is the *guardian* for Ms. Miller, and (2) the derivative claims being released are the derivative claims, if any, that belonged to Ms. Miller, not the derivative claim that belonged to her son. Mr. Miller's claim, pursuant to Florida Statute 768.0415, is derivative in the sense that it is derived from the injuries to his mother, but it is still an independent claim that belonged to him. See Jowanowitch v. Florida Power & Light Co., 381 So. 2d 750, 752 (Fla. 5th DCA 1980).[10] Therefore, the release of all claims that Ms. Miller had or may have would have had no

---

[10]In Jowanowitch, a mother and her minor daughter were injured in an accident. 381 So. 2d. at 751. The mother signed a release of her own claims, and the court found that the mother's release only released the mother's claims for her own injuries, as well as the *mother's* claims for

effect on, and could not release, Mr. Miller's derivative claim. Furthermore, given that the release is being executed by the *guardian of Ms. Miller*, there is no reason to conclude that Ms. Miller's guardian would be releasing (or would have the authority to release) the claims belonging to Mr. Miller.

Plaintiffs have not specifically addressed Nationwide's arguments on this issue, and as such, the Court deems their silence to be a concession as to the merits of these arguments. Accordingly, the Court finds that Nationwide has shown that Gallagher's June 5, 2008 settlement demand did not present a realistic opportunity for settlement, because Plaintiffs refused to accept the Bodily Injury Release.

### E. Nationwide's Communication with Torrey Regarding the June 5th Settlement Demand

Nationwide argues that it properly communicated with Torrey regarding Gallagher's June 5, 2008 settlement demand, and as such, there can be no bad faith in that respect. The Court agrees. On June 9, 2008, Nationwide informed Torrey of the June 5th settlement demand and

---

the injuries to her daughter. See id. at 752. The court was clear that the mother's execution of the release did not release the daughter's claims for her own injuries. See id. Specifically, the court stated that "a parent's individual right of action for a child's injuries is independent of the child's right of action for the same injuries." Id. (citation omitted).

Courts have recognized that parents are entitled to bring a derivative claim for their child's injuries for the same reasons that Florida Statute § 768.0415 provides that a dependant can bring a derivative claim for its parent's injuries. See U.S. v. Dempsey, 635 So. 2d 961, 965 (Fla. 1994). Thus, the Jowanowitch court's conclusion that the mother's derivative claim for her daughter's injuries was independent of her daughter's claim for her own injuries shows that Mr. Miller's derivative claim for Ms. Miller's injuries is independent of Ms. Miller's claim for her own injuries. Therefore, the release of Ms. Miller's direct and derivative claims did not operate as a release of Mr. Miller's derivative claim. See Ryter v. Brennan, 291 So. 2d 55, 57 (Fla. 1st DCA 1974)(stating that a wife's derivative loss of consortium claim arising from injuries to her husband was not affected by her husband's execution of a release of his own claims, because the wife's derivative claim belonged to her). Accordingly, the fact a parent may bring or settle a minor child's derivative claim does not change the fact that the derivative claim belongs to the minor child and not the parent.

forwarded Gallagher's demand letter. (Doc. No. 27-12). On June 16, Russell sent Torrey a letter explaining each condition set forth in Gallagher's settlement demand and informing Torrey of Nationwide's intent to accept the settlement. (Doc. No. 27-15). On June 19, 2008, Russell sent a letter to Gallagher seeking clarification of the sworn statement condition in the settlement demand, and Torrey's attorney was sent a copy of the letter. (Doc. No. 27-17). On June 24, 2008, Russell sent a letter to Gallagher regarding Nationwide's acceptance of the settlement, and Torrey's attorneys were sent a copy of the letter. (Doc. No. 27-20).

Plaintiffs have not specifically addressed Nationwide's arguments on this issue, and as such, the Court deems their silence to be a concession as to the merits of these arguments. Accordingly, the Court finds that Nationwide properly communicated with Torrey regarding Gallagher's June 5, 2008 settlement demand, and as such, there can be no bad faith in that respect.

## IV. Conclusion

Based on the above, and considering the totality of the circumstances, it is clear that Nationwide did not act in bad faith in the handling of the claims against Torrey. Instead, from the very beginning, Nationwide stood ready to tender the full $25,000 bodily injury limit and attempted to tender it. In addition, Nationwide agreed to pay the cost of setting up Ms. Miller's guardianship, which Nationwide was not required to do under the terms of the insurance policy. When its first proposed release was rejected by Gallagher, Nationwide incorporated all of the requested changes into the Bodily Injury Release that it sent as part of its acceptance of Gallagher's June 5th settlement demand. Finally, Nationwide did all that it could to supply a sworn statement accepting all liability for causing the accident, as requested by Gallagher as a

condition of the June 5th settlement demand.

Thus, for the reasons stated above, the Court concludes that Nationwide met its duty to act in good faith to protect the interests of Torrey and that no reasonable juror could find that Nationwide put its interests ahead of Torrey's interests. As such, the Court finds, as a matter of law, that Nationwide did not act in bad faith.

Bad faith law was designed to protect insureds who must surrender to the insurance company control over whether a claim against them is settled. As a result, bad faith jurisprudence merely holds insurers accountable for failing to fulfill their obligations to the insured, and it has played a useful role in encouraging insurance companies to act properly. However, as noted by Justice Wells and reiterated by this Court:

> [T]here are strategies which have developed in the pursuit of insurance claims which are employed to create bad faith claims against insurers when, after an objective, advised view of the insurer's claims handling, bad faith did not occur. This is a strategy which consists of setting artificial deadlines for claims payments and the withdrawal of settlement offers when the artificial deadline is not met. The goal of this strategy is to convert a policy purchased by the insured which has low limits of insurance into unlimited insurance coverage.

Shin Crest PTE, Ltd. v. AIU Ins. Co., 605 F. Supp.2d 1234, 1243 (M.D. Fla. 2009)(quoting Berges, 896 So. 2d at 685).

As a result of the proliferation of bad faith claims, many insurance companies now actively and preemptively attempt to tender the full policy limits to claimants at the earliest possible time. However, given that acceptance of such offers would hinder bad faith claims, strategies such as (1) imposing additional, and often vague, conditions on settlement, (2) imposing short, artificial deadlines for satisfying the conditions, and (3) being unresponsive to the insurance companies' attempts at communication are sometimes employed by claimants and

their counsel.  It appears that this is exactly what happened in the instant case.

For example, Gallagher imposed the condition that Torrey or a Nationwide claims manager provide a sworn statement accepting all liability for causing the accident.  The accident resulted in the death of Swails and significant injury to Ms. Miller, and as a result, Torrey was in jail and facing felony DUI charges; therefore, Gallagher knew that Torrey would not provide such a statement.  That left Nationwide to satisfy the vague condition of providing a statement accepting all liability for causing the accident, and when Nationwide asked for clarification regarding the content of the requested statement, Gallagher refused to provide any.[11]

In addition, when Nationwide submitted the Bodily Injury Release that Gallagher rejected, Gallagher did not just pick up the phone and ask if the "derivative" claim language could be removed.  Instead, he simply rejected Nationwide's attempt to settle and filed suit. When a similar tactic was employed by the injured claimant's attorney in <u>Bankston v. Illinois National Ins. Co.</u>, 6:01-cv-278-Orl-31DAB (attached at Doc. No. 27-26), the court noted that the attorney made no effort to negotiate the terms of the insurance company's release that he found

---

[11]When Gallagher purported to respond to Russell's requests for clarification, Gallagher began his June 23, 2008 letter by stating that he dictated it on June 20, 2008 before leaving on a one-week family vacation.  (Doc. No. 27-18).  There is no explanation for the three day delay in preparing the letter.  Such delay is particularly disturbing given that Gallagher's letter was in response to Russell's letters seeking clarification so that Nationwide could comply by Gallagher's June 25, 2008 deadline.

Furthermore, given that Gallagher's June 23, 2008 letter failed to provide a meaningful response to Russell's questions regarding the amount being sought for Ms. Miller's clothing, as well as the content of the requested statement accepting all liability for causing the accident, the Court is also disturbed by Gallagher's statement in the letter that "I trust I have answered your questions and I really don't see that there is any confusion with the [June 5th] offer."  (Doc. No. 27-18).  Furthermore, given that Gallagher states in the June 23rd letter that he will be "primarily unavailable" through June 27th, the Court finds it disingenuous at best for Gallagher to close the letter by stating "[p]lease let me know if there is anything further that we need to discuss."  (Doc. No. 27-18).

to be objectionable.  See id. at p.10, n.15.  The Bankston court stated that "[o]ne could infer from this circumstance that [the claimant's] attorney was more interested in fabricating a potential bad faith claim than protecting his client[]."[12]  Id. at p.10, n.15.

Finally, it appears that the twenty day time limit imposed in Gallagher's June 5, 2008 settlement demand was an artificial deadline with no real purpose, other than to help "create" a bad faith claim.  When asked why the settlement demand contained a twenty day time limit or why a twenty day period was necessary, McGuire responded that she did not know.  (McGuire depo, p. 61-62).

Having said the above, the Court is mindful that the focus of bad faith claims is the insurer's actions[13], and the Court's observations regarding Gallagher's conduct are not the basis for granting Nationwide's motion for summary judgment.

Accordingly, it is ORDERED AND ADJUDGED that Defendant's Motion for Summary Judgment (Doc. No. 27) is **GRANTED**.  The Clerk is directed to enter judgment in favor of Defendant and to close this case.

**DONE AND ORDERED** at Tampa, Florida, this 5th day of March, 2012.

*Susan C. Bucklew*

SUSAN C. BUCKLEW
United States District Judge

Copies to: Counsel of Record

---

[12]The Bankston court's opinion was affirmed on appeal.  See Bankston v. Illinois National, 54 Fed. Appx. 933 (11th Cir. 2002)(table).

[13]However, the actions of the claimant and his or her attorney can be relevant to the issue of whether there was any realistic possibility of settlement.  See Barry v. GEICO General Ins. Co., 938 So. 2d 613, 618 (Fla. 4th DCA 2006).